IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-84

Filed 5 August 2026

Wake County, No. 22CVD008855-910

KISHA RENEE JORDAN, Plaintiff,

v.

TERRENCE NEPTUNE, Defendant.

Appeal by defendant from order entered 11 June 2024 by Judge Anna Worley in District Court, Wake County. Heard in the Court of Appeals 23 September 2025.

*No brief filed on behalf of plaintiff-appellee.*

*Gailor Hunt Davis Taylor & Gibbs, PLLC, by Jonathan Lambert-Melton, for defendant-appellant.*

STROUD, Judge.

Defendant Terrence Neptune (Husband) appeals the trial court's order on his claim for a declaratory judgment concerning the validity of a premarital agreement the parties executed. Because the court's findings of fact support its conclusions of law on the agreement's validity, we affirm.

## I. Background

Plaintiff Kisha Renee Jordan (Wife) and Husband married on 21 September 2018 and separated in July 2021. On 18 July 2022, Wife filed a complaint for absolute divorce. Husband, acting *pro se*, filed an answer and counterclaims on 19 September

2022. His first counterclaim sought a declaratory judgment on the validity of an "alleged premarital agreement" that "may" have "deal[t] with" equitable distribution and alimony. Husband alleged that the parties executed a document before the marriage that he believed "may have been a premarital agreement," but that despite his "repeated requests," he had "never been given a copy" and so remained "unaware of its contents and validity." He further alleged:

> 8. To the extent that the alleged premarital agreement (a) exists, (b) is valid, and (c) deals with issues related to equitable distribution and/or division of the parties' property and debt and/or post-separation, alimony, and attorney's fees, an actual and genuine controversy and dispute has arisen between the parties related to equitable distribution and/or division of the parties' property and debt and/or post-separation, alimony, and attorney's fees.
>
> 9. [Husband] petitions this court to inquire into whether any alleged premarital agreement exists and, if so, is valid and, if so, to declare the rights, duties, and obligations of the parties related to equitable distribution and/or division of the parties' property and debt and/or post-separation, alimony, and attorney's fees pursuant to any alleged premarital agreement.

Husband alleged no potential defenses to the "alleged premarital agreement"; he questioned only its existence and content. To the extent the "alleged premarital agreement" did not exist, was not valid, or did not bar his claims, Husband also counterclaimed for equitable distribution, post-separation support, alimony, and attorney's fees. The parties divorced on 28 October 2022, and the divorce judgment expressly preserved Husband's pending counterclaims for later determination.

On 12 November 2022, Wife filed a motion to dismiss, affirmative defenses, and a reply to Husband's counterclaims. She attached a copy of the "Premarital Agreement" (premarital agreement or agreement) and alleged that in it, the parties had waived all rights to make claims for equitable distribution, post-separation support, alimony, and attorney's fees. She moved to dismiss Husband's claims under Rule 12(b)(1) (lack of subject matter jurisdiction) and Rule 12(b)(6) (failure to state a claim upon which relief can be granted) of the North Carolina Rules of Civil Procedure. *See* N.C. Gen. Stat. §§ 1A-1, Rule 12(b)(1), (b)(6) (2025). The trial court did not rule on Wife's motion to dismiss.

On 13 February 2024, Wife filed a "Motion for Rule 11 Sanctions" (sanctions motion) against Husband, alleging that he "knew or should have known" that his counterclaims "were not well-grounded in fact, were interposed for an improper purpose, and were not filed in good faith." She made detailed allegations about the parties' communications regarding the premarital agreement, their travel to sign it before a notary public at Wife's attorney's office, and the fact that Husband personally signed the agreement he now claimed might not even exist. She also alleged that Husband had continued to pursue his claims even after receiving a copy of the agreement, causing her to incur substantial attorney's fees.

The trial court heard Husband's declaratory judgment claim and Wife's sanctions motion on 15 May 2024. On 11 June 2024, it entered an order declaring

that the premarital agreement was a valid and enforceable agreement and denying

sanctions. Husband timely filed notice of appeal from the order on 9 July 2024.

## II.   Jurisdiction

We first determine if this Court has jurisdiction over Husband's appeal. In his

view, the trial court's order "is a final judgment of a district court in a civil action and

immediately appealable pursuant to [North Carolina General Statute Section] 7A-27,

because the [o]rder concluded that the premarital agreement executed by the parties

is valid, and therefore, there are no remaining claims to be resolved by the trial court."

But this is not entirely correct because the order does not resolve all the pending

claims.

It is well-established that a

> final judgment is one which disposes of the cause as to all
> the parties, leaving nothing to be determined between
> them in the trial court. An interlocutory order, on the other
> hand, is one made during the pendency of an action which
> does not dispose of the case, but leaves it for further action
> by the trial court in order to settle and determine the entire
> controversy.

*Cagle v. Teachy*, 111 N.C. App. 244, 246–47, 431 S.E.2d 801, 803 (1993) (citation and

quotation marks omitted). Husband brought counterclaims for equitable

distribution, post-separation support, alimony, and attorney's fees, in addition to a

declaratory judgment claim about the premarital agreement. Husband's claim for

equitable distribution stated that it was

> asserted to preserve said counterclaim (a) in the event that

> any alleged premarital agreement does not exist, is not valid, or does not relate to equitable distribution and/or division of the parties' property and debt and/or (b) to the extent that there is property and/or debt of the parties not covered by, or otherwise dealt with in, any alleged premarital agreement.

Husband's post-separation support and alimony claims were asserted in the same manner.

The trial court's order concluded that the premarital agreement was valid. But it did not address whether any property or right to support was "not covered by, or otherwise dealt with in" the agreement and it did not dismiss Husband's claims. The order's decree stated: "This [c]ourt retains jurisdiction over the parties for entry of further orders, modification, and/or enforcement of the provisions of this [o]rder." So the order is interlocutory, because the trial court has not yet dismissed Husband's claims for equitable distribution, post-separation support, and alimony. *See id.*

But we have appellate jurisdiction over Husband's interlocutory appeal under North Carolina General Statute Section 50-19.1:

> Notwithstanding any other pending claims filed in the same action, a party may appeal from an order or judgment adjudicating a claim for absolute divorce, divorce from bed and board, the validity of a premarital agreement as defined by [Section] 52B-2(1), child custody, child support, alimony, or equitable distribution if the order or judgment would otherwise be a final order or judgment within the meaning of [Section] 1A-1, Rule 54(b), but for the other pending claims in the same action.

N.C. Gen. Stat. § 50-19.1 (2025). The order on appeal concerns "the validity of a

premarital agreement as defined by [Section] 52B-2(1)" and is a final order "but for the other pending claims in the same action." *Id.* This Court thus has jurisdiction.

### III. Standard of Review

Our "standard of review in declaratory judgment actions where the trial court decides questions of fact is whether the trial court's findings are supported by any competent evidence. Where the findings are supported by competent evidence, the trial court's findings of fact are conclusive on appeal." *N.C. Farm Bureau Mut. Ins. Co., Inc. v. Phillips*, 255 N.C. App. 758, 761, 805 S.E.2d 362, 364 (2017) (citation and quotation marks omitted). Unchallenged findings of fact are binding on appeal. *Id.* We review the trial court's conclusions of law *de novo. Id.* "Under *de novo* review, we consider the matter anew and are free to substitute our judgment for that of the trial court." *Westmoreland v. High Point Healthcare Inc.,* 218 N.C. App. 76, 79, 721 S.E.2d 712, 716 (2012) (citation omitted). And

> [w]hat is designated by the trial court as a finding of fact will be treated on review as a conclusion of law if essentially of that character. Therefore, the label of fact put upon a conclusion of law will not defeat appellate review. Determinations reached by application of legal principles, like duress and undue influence, are conclusions of law.

*Denis v. Chandler*, 300 N.C. App. 30, 53, 920 S.E.2d 199, 217 (2025) (citation, quotation marks, brackets, and ellipses omitted). Unconscionability is also "a question of law that is reviewed *de novo* on appeal." *Westmoreland,* 218 N.C. App. at 79, 721 S.E.2d at 716.

IV.     **Findings About the Premarital Agreement's Execution**

Before we turn to Husband's arguments, we note that he has not specifically challenged any of the trial court's findings of fact as unsupported by the evidence. Those findings are therefore binding on appeal. *See Peters v. Pennington*, 210 N.C. App. 1, 13, 707 S.E.2d 724, 733 (2011) ("Unchallenged findings of fact are binding on appeal."). And some of the findings should be considered as conclusions of law, so we address those accordingly. *Denis*, 300 N.C. App. at 53, 920 S.E.2d at 217. The facts, as found by the trial court, are as follows:

> 9. Prior to the parties' date of marriage, the following occurred:
>
> A. In 2017, [Wife] told [Husband] at Sullivan's Steakhouse that she wanted him and would need for him to sign a [p]remarital [a]greement prior to their date of marriage;
>
> B. [1]
>
> C. In July 2018, [Wife] told [Husband] that she had hired Kristen Kelley of Boyles Law Firm to draft a [p]remarital [a]greement and asked him if he wanted any . . . property to remain separate and he told her that he did not care to preserve any of his property to remain separate;
>
> D. From July 26, 2018, through August 9, 2018, [Wife] exchanged emails with Kristen Kelley (now Kristen Callihan) regarding the drafting of the [p]remarital [a]greement and received a draft of said [a]greement and scheduled a date and time for the parties to drive from Wake

---

[1] This is blank in the original order.

County, North Carolina, to Wilmington, North Carolina, to go to Ms. Kelley's office to sign said [a]greement;

E. There was no communication between [Husband] and Ms. Kelley regarding the draft premarital agreement. Ms. Kelley did not present [Husband] with a draft of the premarital agreement until [Husband]'s arrival in her office on August 21, 2018.

F. On August 21, 2018, the parties drove together from Wake County, North Carolina, to Wilmington, North Carolina, and executed the [p]remarital [a]greement.

10. In 2017 and 2018, [Wife] made it clear to [Husband] prior to the parties' date of marriage that she would not marry him without the parties executing a [p]remarital [a]greement.

11. [Husband] knew at the time of his execution of the [p]remarital [a]greement at Ms. Kelley's office in Wilmington, North Carolina, that he was signing a [p]remarital [a]greement.

12. [Husband] stated that he had no problem signing the [p]remarital [a]greement at Ms. Kelley's office and failed to raise any concerns regarding said [a]greement between the time he executed said [a]greement and the parties' date of marriage, which was about a month later.

13. [Husband] did not ask any questions about the terms of the [p]remarital [a]greement and only stated that he needed to know where to sign.

14. [Husband] was disinterested in the contents and provisions of the [p]remarital [a]greement prior to and on the day that he executed said [a]greement.

15. [Husband] made a choice to sign the [p]remarital

[a]greement.

16. Prior to signing the [p]remarital [a]greement, [Husband] was aware of and had knowledge of [Wife]'s assets and debts in that:

    A. In 2017, [Wife] disclosed about twelve real properties that she owned in Wilmington, North Carolina, to [Husband] and [Husband] scheduled a meeting with his friend, Joshua Heinberg, in order for Mr. Heinberg to sell insurance for said real properties to [Wife];

    B. [Husband] participated in this 2017 business meeting;

    C. [Husband] provided details to Mr. Heinberg before and after the meeting regarding [Wife]'s real property assets in order for said properties to be insured;

    D. [Wife] and [Husband] regularly discussed their assets and debts and [Husband] acknowledged that the parties discussed the same and displayed said assets and debts on a white board, and that the writing of the same was in his handwriting;

    E. [Wife] and [Husband] regularly visited her real property investments, many of which were in the Wilmington area;

    F. The parties created a car business and exchanged financial information generally and with regard to that business; and

    G. [Wife] disclosed her real property and financial assets to [Husband] in Attachment A to the [p]remarital [a]greement.

17. Paragraph 3.1 of the [p]remarital [a]greement provided that the parties acknowledged that each had made a fair

and reasonable disclosure to the other of his and her assets, financial obligations, income, property, and business interests; said Paragraph provided that the parties acknowledged that each was satisfied with the financial disclosures of the other and each party expressly waived further financial disclosures.

18. The attorney who drafted the [p]remarital [a]greement, Ms. Kelley, testified that it was the practice in her office to give an original of a [p]remarital [a]greement to both parties after execution of the [a]greement and that she retained an original copy of the [p]remarital [a]greement also, which included the Attachment A in which [Wife] disclosed to [Husband] her assets. However, she did not have independent knowledge that it occurred in this case.

19. Ms. Kelley testified that [Husband] came to her office and signed the [a]greement.

20. [Husband] testified that he provided his driver's license to the notary in Ms. Kelley's office prior to signing the [p]remarital [a]greement.

21. [Husband] voluntarily executed the [p]remarital [a]greement.

22. The [p]remarital [a]greement was not unconscionable prior to and at the time of execution of said [a]greement because [Wife] provided [Husband] a fair and reasonable disclosure of her assets in 2017 and in 2018 before the date of marriage, [Husband] voluntarily and expressly waived in writing any right to financial disclosure in the [p]remarital [a]greement, and [Husband] had knowledge of [Wife]'s assets prior to the execution of the [a]greement.

23. The [c]ourt cannot find that [Husband]'s [d]eclaratory [j]udgment action (as it relates to issues regarding the validity of the parties' August 21, 2[01]8, [p]remarital [a]greement) is frivolous and sanctionable. Even if [Husband]'s inquiry into whether there was a [p]remarital [a]greement and, if so, what the terms of the [p]remarital [a]greement were, was insufficient, the question of whether

that [p]remarital [a]greement is valid remains. And based on the legal authorities presented by [Husband], the court cannot determine the claim to be frivolous or sanctionable.

Based on these findings, the trial court concluded that "[Husband] voluntarily signed" the premarital agreement. The court also ruled:

> The [p]remarital [a]greement was not unconscionable prior to and at the time of execution of said [a]greement because [Wife] provided [Husband] a fair and reasonable disclosure of her assets in 2017 and in 2018 before the date of marriage, [Husband] voluntarily and expressly waived in writing any right to financial disclosure in the [p]remarital [a]greement, and [Husband] had knowledge of [Wife]'s assets prior to the execution of the [a]greement.

## V. Law on Premarital Agreements

In 1987, North Carolina adopted the Uniform Premarital Agreement Act (UPAA), now codified at North Carolina General Statute Chapter 52B. 1987 N.C. Sess. Laws ch. 473, § 3. The agreement here is a "premarital agreement" under Section 52B-2. *See* N.C. Gen. Stat. § 52B-2(1) (2025) (defining "premarital agreement" as "an agreement between prospective spouses made in contemplation of marriage and to be effective upon marriage"). Section 52B-7(a) sets out what a party must prove to avoid enforcement:

> (a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:
>
> (1) That party did not execute the agreement voluntarily; or
>
> (2) The agreement was unconscionable when it was executed and, before execution of the agreement,

that party:

    a. Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

    b. Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

    c. Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

N.C. Gen. Stat. § 52B-7(a) (2025).

The statute thus places the burden of proof on "the party against whom enforcement is sought"—here, Husband—to establish grounds on which the agreement may be declared unenforceable or invalid. *Id.* And it gives him two ways to carry that burden. *See id.* Under the first, Husband must prove that he "did not execute the agreement voluntarily." N.C. Gen. Stat. § 52B-7(a)(1). The second demands more. Husband must prove that "the agreement was unconscionable when it was executed," and that, before he executed it, he (a) "was not provided a fair and reasonable disclosure of the property or financial obligations of" Wife; (b) "did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided"; and (c) "did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of" Wife. N.C. Gen. Stat. § 52B-7(a)(2). The upshot, as one

treatise observes, is that the UPAA

> seeks to ensure enforcement. The effect of [Section] 52B-7(a)(2) is to enforce an agreement even if it was unconscionable when executed as long as the moving party received a fair and reasonable disclosure *or* waived disclosure *or* reasonably could have had an adequate knowledge of the "property or financial obligations of the other party."

1 Reynolds on North Carolina Family Law § 1.17 (2025).

## VI.    Premarital Agreement's Validity

Husband argues that "the trial court erred in concluding that the premarital agreement is valid." Specifically, he contends that the agreement is unenforceable because "the parties were in a confidential relationship, [Wife] failed to make a full financial disclosure, and [Husband] did not have adequate knowledge of [Wife's] assets." Most of his argument focuses on the adequacy of Wife's financial disclosures, which can bear on both voluntariness and unconscionability. *See* N.C. Gen. Stat. §§ 52B-7(a)(1), (a)(2). Though Husband never says so explicitly—likely because he cannot meet the statute's requirements—this part of his argument seeks to set the agreement aside under Section 52B-7(a)(2), the unconscionability provision. *Id.* And insofar as financial disclosure is relevant to the agreement's voluntary execution under Section 52B-7(a)(1), we review Husband's argument regarding the trial court's findings. *See id.* § 52B-7(a)(1).

Husband also claims that he was "under duress and did not voluntarily execute the premarital agreement." This portion of his argument falls under Section 52B-

7(a)(1), which deals with voluntariness. *See id.* § 52B-7(a)(1). We address each argument below.

## A. Preservation of Issues for Appellate Review

We note at the outset that Husband—who bears the burden of proof under Section 52B-7—never pleaded inadequate disclosure of assets, duress, or unconscionability as an affirmative defense to the agreement. His counterclaim for declaratory judgment alleged only that he did not know whether an agreement existed, and if one did, what it said. Even after Wife filed her reply to his counterclaims and attached the notarized agreement Husband had duly executed, he pleaded no specific affirmative defense.

Under Rule 8(c) of the North Carolina Rules of Civil Procedure, a party must set forth affirmative defenses in the pleadings. N.C. Gen. Stat. § 1A-1, Rule 8(c) (2025). In *Howell v. Landry*, this Court applied that requirement to a party seeking to avoid enforcement of a premarital agreement on grounds of duress, unconscionability, and inadequate disclosure:

> As the defenses of undue influence, duress, fraud, unconscionability and inadequate disclosure are all affirmative in nature, they must be affirmatively pled. This record does not reveal any such pleadings. However, as the trial court addressed the issues of duress and undue influence, without any objection from the husband, those issues were necessarily before the trial court for determination, and the pleadings are regarded as amended to conform to the proof even though the defaulting pleader made no formal motion to amend. As the defenses of unconscionability, fraud and inadequate disclosure were

> neither pled nor litigated, those issues are not properly raised and will not be addressed by this court.

96 N.C. App. 516, 526, 386 S.E.2d 610, 616 (1989) (citation and quotation marks omitted); *see also Johnson v. Johnson*, 259 N.C. App. 823, 830, 817 S.E.2d 466, 473 (2018) ("Unconscionability is an affirmative defense, and the party asserting it bears the burden of establishing it." (citation and quotation marks omitted)).

Here, despite the lack of pleadings, inadequate disclosure was the main issue litigated before the trial court: the record reveals no objection from Wife, and the court's order addressed this issue. Accordingly, we may review Husband's inadequate disclosure argument on appeal. *Howell*, 96 N.C. App. at 526, 386 S.E.2d at 616. The record, however, reveals nothing comparable for duress or unconscionability.

At trial, Husband's counsel argued that Husband was under duress. But counsel mentioned the word "duress" only briefly—noting mainly that Wife refused to marry Husband unless he signed a premarital agreement—and the trial court made no findings or conclusions on it. The word "duress" does not appear in our printed record on appeal, and Husband did not affirmatively plead it. Nor did Husband argue unconscionability to the trial court. Wife's counsel used the word seven times in her arguments to the trial court, each time contending that Husband had not shown unconscionability under Section 52B-7. And Husband did not argue otherwise. Because Husband "neither pled nor litigated" duress and unconscionability, those issues are "not properly raised and will not be addressed by

this court." *Id.*

## B. Inadequate Financial Disclosure

Husband argues that the agreement was not enforceable because "the parties were in a confidential relationship, [Wife] failed to make a full financial disclosure, and [Husband] did not have adequate knowledge of [Wife's] assets." This portion of his argument really seeks to set the agreement aside under Section 52B-7(a)(2), because this subsection deals with financial disclosure.[2]

Subsection 52B-7(a)(2) requires unconscionability. N.C. Gen. Stat. § 52B-7(a)(2). In finding 22, the trial court found that the agreement was not unconscionable—a determination that is, as noted above, a conclusion of law we review *de novo*. *See Westmoreland*, 218 N.C. App. at 79, 721 S.E.2d at 716. We need not address this conclusion, though, because Husband never pleaded unconscionability, never argued it to the trial court, and never explicitly argues it on appeal.[3] And without unconscionability, Husband cannot set the agreement aside under Section 52B-7(a)(2): the statute requires him to prove both that the agreement

---

[2] Although this agreement was entered under the UPAA, Husband's brief does not cite any cases addressing agreements entered under that Act. When "construing premarital agreements executed after 1 July 1987, . . . we must bear in mind, in addition to general contract principles, the strict requirements of the [UPAA]." *Huntley v. Huntley*, 140 N.C. App. 749, 752–53, 538 S.E.2d 239, 241 (2000). In *Huntley*, a case where "all but one of the authorities cited by the husband either pre-date[d] the [UPAA], or concern[ed] contracts other than premarital agreements," this Court noted that "those authorities [we]re not controlling. The one authority cited by the husband concerning a premarital agreement executed after 1 July 1987 [wa]s not dispositive." *Id.* at 753, 538 S.E.2d at 241 (citation omitted).

[3] Husband cites no cases in support of unconscionability. His brief mentions the word only twice: once in mentioning Section 52B-7, and once in noting the trial court's finding (really a conclusion of law) that the agreement was not unconscionable.

was unconscionable and that all three disclosure conditions that follow are met. *See* N.C. Gen. Stat. § 52B-7(a)(2).

To the extent financial disclosure bears on the agreement's voluntary execution under Section 52B-7(a)(1), we address Husband's argument about the trial court's findings. His argument centers on the testimony and evidence about Wife's disclosure of assets and Husband's knowledge of their extent. At the hearing, Husband, Wife, and Ms. Callihan—the attorney who prepared the agreement—testified, and both parties presented exhibits. Husband mainly asserts that the court should have made different findings on the extent of his knowledge of Wife's assets. Findings 16 and 17 address the parties' financial disclosures and the agreement's provisions on that point:

> 16. Prior to signing the [p]remarital [a]greement, [Husband] was aware of and had knowledge of [Wife]'s assets and debts in that:
>
> > A. In 2017, [Wife] disclosed about twelve real properties that she owned in Wilmington, North Carolina, to [Husband] and [Husband] scheduled a meeting with his friend, Joshua Heinberg, in order for Mr. Heinberg to sell insurance for said real properties to [Wife];
> >
> > B. [Husband] participated in this 2017 business meeting;
> >
> > C. [Husband] provided details to Mr. Heinberg before and after the meeting regarding [Wife]'s real property assets in order for said properties to be insured;

    D.     [Wife] and [Husband] regularly discussed their assets and debts and [Husband] acknowledged that the parties discussed the same and displayed said assets and debts on a white board, and that the writing of the same was in his handwriting;

    E.     [Wife] and [Husband] regularly visited her real property investments, many of which were in the Wilmington area;

    F.     The parties created a car business and exchanged financial information generally and with regard to that business; and

    G.     [Wife] disclosed her real property and financial assets to [Husband] in Attachment A to the [p]remarital [a]greement.

17. Paragraph 3.1 of the [p]remarital [a]greement provided that the parties acknowledged that each had made a fair and reasonable disclosure to the other of his and her assets, financial obligations, income, property, and business interests; said Paragraph provided that the parties acknowledged that each was satisfied with the financial disclosures of the other and each party expressly waived further financial disclosures.

Although the agreement stated that "each party has made a fair and reasonable disclosure to the other of all property, interests in property, financial obligations, and business interests," Husband asserts that "there was absolutely no testimony or evidence presented at trial" that Wife had shared with him the questionnaire she completed for her attorney to use in preparing the agreement. But nothing requires a specific form of evidence to prove adequate disclosure. The trial court is the sole judge of the weight and credibility of the evidence. *See Sauls v. Sauls,*

236 N.C. App. 371, 373, 763 S.E.2d 328, 330 (2014) (noting that "[i]t is the duty of the trial judge to weigh and consider all competent evidence, and pass upon the credibility of the witnesses, the weight to be given their testimony and the reasonable inferences to be drawn therefrom" (citation and quotation marks omitted)).

The trial court here resolved any conflicts in the evidence, and this Court is not at liberty to make new findings of fact regarding Husband's knowledge of Wife's assets. *See id.* The court's findings of fact addressed Wife's disclosure, Husband's knowledge, and his express written waiver of further disclosure. Competent evidence supports those findings.

**C. Voluntary Execution**

Finally, Husband argues that he was "under duress and did not voluntarily execute the premarital agreement." He claims that he "did not have independent advice," that the parties were already living together in a residence owned by Wife, and that Wife had "considerably more assets" than he did at the time of the premarital agreement.

The trial court made a finding of ultimate fact that "[Husband] voluntarily executed the [p]remarital [a]greement" in finding 21. This ultimate finding is based on findings 10 through 20.

On appeal, Husband argues that his signature was not voluntary because he was under duress. But as mentioned above, duress is an affirmative defense, and we do not examine it: Husband neither pleaded nor litigated duress below, and the trial

court's order did not address it. *Howell*, 96 N.C. App. at 526, 386 S.E.2d at 616. Husband next argues that the evidence showed that Wife "was not trustworthy," but this argument also goes to the credibility of the evidence, which we cannot review on appeal. *See Sauls*, 236 N.C. App. at 373, 763 S.E.2d at 330. His voluntariness argument also points to his lack of independent legal advice and to deficiencies in Wife's financial disclosure. But we have already addressed the court's findings on Wife's disclosure and Husband's knowledge of her assets, and the findings on the circumstances of execution defeat his voluntariness argument too.

Husband's contention that the trial court erred in finding that he voluntarily executed the agreement—based on his lack of knowledge of the agreement's terms and his lack of independent counsel—is refuted by *Kornegay v. Robinson*, 176 N.C. App. 19, 625 S.E.2d 805 (Tyson, J., dissenting), *rev'd*, 360 N.C. 640, 637 S.E.2d 516 (2006). There, our Supreme Court reversed this Court "[f]or the reasons stated in" Judge Tyson's dissent. *Kornegay*, 360 N.C. at 640, 637 S.E.2d at 516. The dissent addressed a premarital agreement entered under the UPAA:

> [The p]laintiff now contends she did not "voluntarily" sign the premarital agreement "due to totality of the circumstances existing at the time of execution of the Agreement." [The p]laintiff argues her lack of legal counsel and lack of an opportunity to obtain legal counsel "are important elements in the circumstances surrounding her execution of the Agreement." [The p]laintiff acknowledged in her deposition she never requested: (1) additional time to read the agreement; or (2) another attorney to be present to explain the agreement before she signed it. This case fits squarely within the facts and holding of *Howell*[, 96

N.C. App. at 524, 386 S.E.2d at 615].

This Court has held contract rules apply to premarital agreements.

> "Absent fraud or oppression . . . parties to a contract have an affirmative duty to read and understand a written contract before signing it." And, when "interpreting contract language, the presumption is that the parties intended what the language used clearly expresses, and the contract must be construed to mean what on its face it purports to mean."
>
> [The p]laintiff's argument that her execution was not voluntary because she did not read the agreement is without merit. [The p]laintiff had "an affirmative duty to read and understand the premarital agreement before signing it." [The p]laintiff provided no evidence she was prevented from reading the agreement or that she sought separate counsel prior to signing the agreement. [The p]laintiff admitted both in the agreement and at her deposition that she "voluntarily" signed the agreement.

*Kornegay,* 176 N.C. App. at 30–31, 625 S.E.2d at 811–12 (Tyson, J., dissenting)

(internal citations, quotation marks, brackets, and ellipses omitted).

Thus, we reject Husband's contention that the trial court erred in finding that he voluntarily executed the agreement based on his lack of knowledge. We also note that the agreement expressly addressed "REPRESENTATION BY COUNSEL:"

> Each party has been separately represented by an attorney of his or her own choice, or has had the opportunity to consult with an independent attorney of his or her choice, with [Wife] having been represented by Kristen K. Callihan, of the Boyles Law Firm, PLLC . . . and [Husband] having been represented by the attorney of his choice or having had the opportunity to consult with an attorney of

his choice.

Husband's argument that the court erred in finding that he voluntarily executed the agreement is without merit.

## VII.    Conclusion

For the reasons discussed above, we affirm the trial court's order.

AFFIRMED.

Judge COLLINS concurs.

Judge GRIFFIN concurs in the result only.